1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KRONENBERGER BURGOYNE, LLP**
Henry M. Burgoyne, III (CA Bar No. 203748)
Karl S. Kronenberger (CA Bar No. 226112)
Jeffrey M. Rosenfeld (CA Bar No. 222187)
150 Post Street, Suite 520
San Francisco, CA 94108
Telephone:  (415) 955-1155
Facsimile:   (415) 955-1158
hank@kronenbergerlaw.com
karl@kronenbergerlaw.com
jeff@kronenbergerlaw.com

**SHAPIRO HABER & URMY LLP**
Edward F. Haber (admitted *pro hac vice*)
Todd S. Heyman (admitted *pro hac vice*)
Robert E. Ditzion (admitted *pro hac vice*)
53 State Street
Boston, MA 02109
Telephone: (617) 439-3939
Facsimile: (617) 439-0134
ehaber@shulaw.com
theyman@shulaw.com
rditzion@shulaw.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **VIOLETTA HOANG, LIVIA HSIAO, and MICHAEL BLACKSBURG** individually and on behalf of a class of similarly situated persons<br><br>          Plaintiffs,<br><br>     vs.<br><br>**REUNION.COM, INC.,** a California corporation,<br><br>          Defendant. | Case No. 3:08-cv-03518-MMC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S AMENDED MOTION TO DISMISS** |

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

1

2

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................ 1

II. FACTUAL BACKGROUND ...................................................................................... 5

    A. The Origination and Content of the Allegedly Unlawful Emails ........................ 5

    B. There is Extensive Consumer Outrage Over Reunion.com's False and

        Deceptive Marketing Scheme .......................................................................... 6

III. MOTION TO DISMISS STANDARD ....................................................................... 9

IV. ARGUMENT ......................................................................................................... 10

    A. The Plaintiffs' Claims Are Not Preempted ..................................................... 10

        1. Federal Preemption Doctrine Has Three Distinct Branches................. 10

        2. Plaintiffs' Claims are Not Subject to Express or Field Preemption ....... 11

        3. Plaintiffs' Claims are Not Subject to Implied Preemption ..................... 13

            a. The Inclusion of an Express Preemption Provision Forecloses

               Implied Preemption Absent Clear and Manifest Congressional

               Intent to the Contrary ................................................................. 13

            b. Even if Congress Had Intended Implied Preemption to be

               Available Under CAN SPAM, There Can Be No Implied

               Preemption by the FTC Absent an Explicit Rule Codified in the

               CFR that Permits the Challenged Conduct ............................... 14

            c. Even if the Federal "Routine Conveyance" Defense Could Be

               Invoked to Support an Implied Preemption Defense, It Would Fail

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

as a Matter of Fact - and Certainly Could Not Be Resolved on a

Motion to Dismiss ........................................................................ 15

B. Whether the Emails Contain False and Misleading From or Subject Lines, or

Other Header Information, is a Question of Fact for the Jury ........................ 20

V. CONCLUSION ............................................................................. 23

**TABLE OF AUTHORITIES**

*Altria Group, Inc. v. Good,* 2008 WL 2472389 (June 2008)  ..................................... 13,15

*American Fin'l Services Assn. v. FTC,* 767 F.2d 957 (D.C. Cir. 1985) ......................... 14

*Bell AtlanticCorp. v. Twombly,* 127 S. Ct. 1955 (2007).................................................. 10

*Branch v. FDIC,* 825 F.Supp. 384 (D.Mass. 1993)....................................................... 20

*Chemical Specialties Manufacturers Association, Inc. v. Allenby,* 958 F.2d 941 (9th Cir.

    1992), cert. denied, 506 U.S. 825 (1992)................................................................ 11

*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504 (1992) ............................................ 11, 14

*English v. General Electric Co.,* 496 U.S. 72 (1990)...................................................... 10

*Foresberg v. Fidelity Nat'l Credit Serv's Ltd.,* Civ. A. No. 03-2193, 2004 WL 3510771

    (S.D.Cal. Feb. 26, 2004) ........................................................................................ 21

*Freightliner Corp. v. Myrick,* 514 U.S. 280 (1995) ....................................................... 14

*In re: Gilead Sciences Securities Litig.,* 536 F.3d 1049 (9th Cir. Aug. 11, 2008)........... 10

*Jackson National Life Ins. Co. v. Greycliff Partners Ltd.,* 226 B.R. 407 (S.C. 1995)...... 20

*Katherine Gibbs School v. FTC,* 612 F.2d 658 (2nd Cir. 1979) ..................................... 14

*Kleffman v. Vonage Holdings Corp.,* Civ.A. No. 07-2406, 2007 WL 1518650 (C.D.Cal.

    May 23, 2007)........................................................................................................ 12

*Linear Technology Corp. v. Applied Materials, Inc.,* 152 Cal. App. 4th 115 (2007) ........ 21

*Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525 (2001)..................................................... 14

*MySpace, Inc. v. The Globe.com,* Civ. A. No. 06-3391, 2007 WL 1686966 (C.D.Cal.,

    Feb. 27, 2007)....................................................................................................... 22

*Slack v. Fair Isaac Corp.,* 390 F.Supp.2d 906 (N.D.Cal. 2005) ............................... 6, 20

1

*State v. Amoco Oil Co.,* 97 Wis.2d 226 (Wis.Sup. Ct. 1980) .......................................... 14

2

*U.S. v. Philip Morris,* 263 F.Supp.2d 72 (D.D.C. 2003) ................................................. 14

3

4

*Williams v. Gerber Product Co.,* 523 F.3d 934 (9th Cir. 2008) ...................................... 20

5

6

**Statutes**

7

15 U.S.C. §7701 *et seq.* ("CAN-SPAM"). ...............................................................*passim*

8

15 U.S.C. §7707(b)(1) .......................................................................................*passim*

9

15 U.S.C. §7702(9) ..........................................................................................*passim*

10

11

16 C.F.R. §316.1 to 316.6 ...............................................................................*passim*

12

Federal Rules of Civil Procedure 8 ....................................................................*passim*

13

14

California Business and Professions Code Section 17529......................................*passim*

15

California Business and Professions Code Section 17529.1(n) ............................*passim*

16

California Business and Professions Code Section 17529.5...............................*passim*

17

18

**Other Authorities**

19

20

Sen. Rep. 108-102 at 15 (2003), *reprinted in* 2004 U.S.C.CA.N. 2348, 2003 WL

21680759 ................................................................................................. 16

21

22

Verkuil, Paul R., *Preemption of State Law by the Federal Trade Commission,* 1976

23

Duke L.J. 225, 247 (1976) .................................................................... 15

24

25

26

27

28

1    Plaintiffs Violetta Hoang, Livia Hsiao and Michael Blacksburg ("Plaintiffs"), on

2    behalf of themselves and all similarly-situated individuals, hereby oppose Defendant

3    Reunion.com, Inc. ("Defendant" or "Reunion.com")'s amended motion to dismiss

4    pursuant to Federal Rule of Civil Procedure 12(b)(6).

5    **I.    INTRODUCTION**

6    Reunion.com, Inc. boasts that it has, in five years, grown to be one of the most

7    popular people search and social networking websites in the United States with over 45

8    million registered members.  It may be that Reunion.com is growing so quickly, as it

9    argues, because it offers a unique opportunity for friends and loved ones to re-connect

10   by means of the Internet.  However, it may also be due to Reunion.com's widespread

11   use of deceptive marketing practices that exploit the personal relationships of

12   Reunion.com's members and apparent members to lure in unsuspecting new registrants.

13   Those practices have engendered widespread outrage amongst Internet users, and have

14   spawned scores of consumer complaints to the Federal Trade Commission ("FTC") and

15   the Better Business Bureau.   This lawsuit is about just one of those practices:

16   Reunion.com's sending of false and misleading commercial email disguised as personal

17   pleas by its members to "Connect" with them.  Aggravating this deceptive practice and

18   further fueling consumer outrage, Reunion.com often obtains the email addresses for its

19   deceptive email marketing campaigns by "hijacking" its members' personal email address

20   books, copying all of its members' email addresses, and thereafter sending the deceptive

21   bulk email to all of those email addresses.

22   This deceptive email marketing practice violates California law.   In enacting

23   California Business and Professional Code Section 17529, the California legislature

24   sought to prevent Internet marketers from doing precisely what Renuion.com does:

25   tricking email recipients into opening advertisements by leading them to believe (i) that

26   the emails are from someone other than the advertiser, or (ii) that the content of the email

27   is something other than a commercial advertisement.  The legislature found that such

28   deceptive commercial e-mail advertisements are far more than an annoyance, and

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

1  indeed constitute an increasing drain on corporate budgets and a threat to the continued

2  usefulness of e-mail – "the most successful tool of the computer age."  Cal. Bus. & Prof.

3  C. § 17529.  Reflecting the legislature's determination to eliminate the use of deceptive

4  email marketing, the statute provides for liquidated damages of one thousand dollars for

5  each e-mail advertisement transmitted in violation of the statute, regardless of whether

6  any particular victim of the practice was actually deceived by the email.  Cal. Bus. & Prof.

7  C. § 17529.5.

8       As explained in its privacy policies, which are referenced in the complaint and

9  therefore properly before this Court, Reunion.com obtains the "email contacts" of its

10  members' personal email accounts under the guise that "[Reunion.com] will automatically

11  send your friend a[n] … email inviting him or her to visit the site."  What appears in the

12  recipients' email in-boxes, however, is something entirely different.  **First,** contrary to the

13  explicit representation in the privacy policy that Reunion.com "will send" the emails, the

14  emails falsely state in the "From" line that they are from the individual member, *not*

15  Reunion.com.   Reunion.com achieves this subterfuge by using both false header

16  information and the individual's name in the "From" line, and, in some cases, the

17  individual's actual personal email address as well.  In the cases of Plaintiffs Hoang and

18  Hsiao, Reunion.com even falsely signed the emails using its members' names.  **Second,**

19  the emails contain unauthorized false and misleading "Subject" lines, stating "Please

20  Connect With Me :-)", or "[Jane Doe] Wants to Connect with You", or something

21  substantially similar, with neither a reference to Reunion.com, nor any indication that the

22  content of the email is commercial in nature.  **Third,** the email contains a message that

23  falsely states that "I looked for you on Reunion.com, but you weren't there.  Please

24  connect with me so we can keep in touch," or something substantially similar.  In reality,

25  the email was not the result of an unsuccessful search for the email recipient by the

26  Reunion.com member and was not a message from the member asking the recipient to

27  "connect with me."

28       Reunion.com's unlawful, deceptive practices are not innocent oversights.  Like the

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

1   California Legislature, Reunion.com obviously knows that people are more likely to open

2   a personal email from a friend or colleague than an advertiser's commercial solicitation.

3   By sending the deceptive emails to the contacts in its members' email address books

4   (often in an indiscriminate bulk fashion), Reunion.com defrauds new people into joining

5   to make the promised personal connection, and gains access to new address books to

6   continue to perpetrate its fraudulent email campaign.   Reunion.com's practices have

7   sparked extensive consumer outrage, and its fraudulent email scheme has been

8   identified by the Better Business Bureau – which gives Reunion.com a D rating, the

9   second lowest of eleven possible ratings – warning consumers to exercise caution when

10  doing business with it.   Notwithstanding Defendant's vitriolic and indignant rhetoric,

11  Plaintiffs have more than satisfied their obligation to plead facts demonstrating that the

12  emails are false and deceptive in violation of California law.

13      Defendant's only other argument is that Plaintiffs' claims are invalid based on the

14  doctrine of federal preemption.   The thrust of Reunion.com's preemption argument is that

15  Plaintiffs' state law claims are preempted by the "Controlling the Assault of Non-Solicited

16  Pornography Act of 2003" ("CAN-SPAM"), and by the FTC's interpretation of one

17  particular provision of CAN-SPAM, which exempts entities from liability when they did not

18  initiate the email at issue, but simply acted as a technical intermediary engaged in a

19  "routine conveyance" of the email.   15 U.S.C. §7702(9).   Reunion.com's preemption

20  arguments confusingly mix elements of express and implied preemption doctrine.

21  Separately considered, each fails.

22      Defendants' first argument that the statutory text of the CAN-SPAM act preempts

23  Plaintiffs' claims is simply wrong.   The plain language of the statute's preemption

24  provision expressly states that CAN-SPAM does *not* preempt state laws that prohibit

25  falsity and deception in the sending of commercial emails – such as California's Section

26  17529.  15 U.S.C. §7707(b)(1).

27      Defendant's second argument is not clearly articulated.   Defendant appears to

28  argue that it merely serves as a technical intermediary that forwards the allegedly

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

1   unlawful email messages at the behest of its members, what CAN-SPAM refers to as an

2   act of "routine conveyance."  Under CAN-SPAM, such a technical intermediary is exempt

3   from liability if it limits its role in the transaction to that of performing only a "routine

4   conveyance" of the email.   15 U.S.C. §7702(9).   Because this doctrine is not part of

5   California law, Defendant appears to assert the argument as some form of implied

6   preemption defense, premised on the FTC's analysis of what the term "routine

7   conveyance" means in a particular factual circumstance.  The FTC's discussion of the

8   term is not contained in any formal FTC Rule in the Code of Federal Regulations ("FTC

9   Rule"), but instead in the introductory Statement of Basis and Purpose (the "FTC

10  Statement") that it published in conjunction with its Rules concerning CAN-SPAM.  (*See*

11  Declaration of Dominique R. Shelton, Exhibit A, Docket No. 15, filed by the Defendant.)

12  Reunion.com contends that if its conduct would be exempt under federal law, it must also

13  be exempt under state law – a position entirely unsupported by CAN-SPAM's text,

14  Section 17529's text, any FTC Rule, or even the FTC Statement itself.

15      As explained below, there can be no express or implied preemption based on

16  either the CAN-SPAM's definition of "routine conveyance" or that of the FTC.  However,

17  even if such a preemption argument were available, Defendant's admitted conduct is not

18  a "routine conveyance" as that term is defined in the very FTC Statement upon which it

19  relies.   According to the FTC, if the entity claiming to have performed a "routine

20  conveyance" retains the recipient email address after performing the technical function of

21  sending the email, it cannot avail itself of the "routine conveyance" exemption under

22  CAN-SPAM.  (FTC Statement at 73, n.192.)   Here, Reunion.com has admitted in its

23  moving papers and in its Privacy Policy (referenced in the complaint and attached as

24  Exhibits A and B to the Declaration of Larry Baird) ("Baird Decl.") (Docket No. 16) that it

25  retains the recipient email address to track the success of its marketing program (i.e.

26  whether a recipient opens and responds to the email, and eventually joins Reunion.com)

27  *and* to send subsequent commercial solicitations if the first email advertisement proves

28  unsuccessful.  Using the recipient email address to carry out a sophisticated marketing

1  campaign, and retaining those emails in furtherance of that marketing campaign, falls far

2  outside the narrow confines of the FTC's definition of a routine conveyance.  Thus, as

3  explained below, Defendant's preemption argument fails as a matter of law and as a

4  matter of *undisputed fact*.

5       For all these reasons, the Court should deny Defendant's motion to dismiss.

6  **II.    FACTUAL BACKGROUND**

7       **A. The Origination and Content of the Allegedly Unlawful Emails**

8       In order to become a registered member of Reunion.com, a person must provide

9  his or her first name, last name, email address, gender and date of birth.  (Complaint,

10  ¶18.) Additionally, Reunion.com asks registered members to provide the email address

11  and password to the registered member's personal email account.  (*Id.*)  Reunion.com

12  uses the registered member's email password to access his or her email account's

13  address book (such as a Yahoo, AOL, Hotmail, or Gmail email account).  (*Id.* ¶19.)  As

14  set forth in Reunion.com's Privacy Policy, referenced in the complaint and attached as

15  exhibits to the Baird Decl., filed by the Defendant, Reunion.com purports to access the

16  registered member's email address book for the purpose of sending emails "from

17  Reunion.com" to the contacts in the address book "inviting them to join."  (*Id.* ¶ 19.)

18       The emails sent by Reunion.com to registered members' email contacts, however,

19  are carefully disguised so as not to appear to come "from Reunion.com," but from

20  registered members personally, in that registered members' names appear in the emails'

21  "From" lines.   In some cases, the "From" lines also misleadingly contain registered

22  members' personal email addresses, including the domain names of the registered

23  members' email service providers, and, on information and belief, without any

24  authorization from such email service providers.  (*Id.* ¶¶ 20, 24-25, 27-28, 30-33.)

25       Moreover, the emails' subject lines do not invite recipients to join Reunion.com.

26  Instead, they state, "Please Connect with Me :-)", or "[Jane Doe] Wants to Connect with

27  You", or something substantially similar, with no reference to Reunion.com and no

28  indication that that the message contains an unsolicited commercial advertisement or

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

1    concerns a commercial subject matter.  (*Id.* ¶¶ 21, 24, 26, 27, 29, 30-32, 34.)

2         The emails' headers and subject lines create the deceptive appearance of a

3    personal request from the registered member to "connect" with the recipient, rather than

4    the Reunion.com's unsolicited commercial email advertisement.   (*Id*. ¶23.)   That

5    deception is intended by Reunion.com to encourage recipients to open and read the

6    emails, when recipients might otherwise ignore the emails as one more piece of

7    unsolicited commercial email advertising.  (*Id.*)

8         Additionally, the body text of the email falsely states, "I looked for you on

9    <u>Reunion.com</u>, but you weren't there.  Please connect with me so we can keep in touch,"

10   or something substantially similar, even though no such searches have been conducted

11   by the registered member.  (*Id.* ¶¶ 22, 24, 27, 31.)  If the recipient believes that a friend

12   or colleague was "looking for" the recipient but was unable to locate them, that person is

13   much more likely to accept Reunion.com's invitation to become a member in order to

14   make contact with the person Reunion.com falsely stated was "looking for" the recipient.

15   With each new member, Reunion.com can gain access to more email addresses

16   contained in the new member's address book, permitting it to sustain and propagate its

17   fraudulent email marketing campaign.

**B.    There is Extensive Consumer Outrage Over Reunion.com's False and
Deceptive Marketing Scheme.**

20        The deceptive nature of Reunion.com's email marketing practices which are the

21   subject of the complaint have fueled widespread consumer outrage.[1]  Attached as Exhibit

22   A to the accompanying Declaration of Margarita Calpotura ("Calpotura Decl." or "Calp.

---

[1] While these detailed facts are neither pled in the complaint nor needed to clear the
lenient pleading hurdle established by Rule 12(b)(6), Plaintiffs introduce them for two
reasons.  First, these facts combat the numerous offensive, irrelevant, and improper
personal attacks on Plaintiffs' counsel in Reunion.com's brief by demonstrating
unequivocally that this litigation is not a lawyer-driven "shake-down," nor a "get rich
scheme" that unfairly targets a company engaged in "honest, legitimate business."
Second, these facts demonstrate the impropriety of Defendant's filing a motion to dismiss
that implicates factual issues, most notably, whether Reunion.com's email marketing
scheme uses false and misleading headers, subject lines, and text in the body of the
message.  *See e.g., Slack v. Fair Isaac Corp.*, 390 F.Supp.2d 906, 913 (N.D.Cal. 2005)
("determining whether defendants' conduct amounts to a fraudulent or deceptive practice
. . . involves questions of fact that are not properly addressed on a motion to dismiss.").

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

Decl.") are over fifty of approximately two hundred consumer complaints filed against Reunion.com with the FTC. These complaints were obtained by Plaintiffs' counsel through a Freedom of Information Act Request. (Calp. Decl. ¶2.) These complaints directly mirror many of the factual allegations in the Complaint. Indeed, one consumer not only complained about Reunion.com's deceptive emails, but astutely surmised (and accurately described) exactly how, factually, the fraudulent marketing scheme works:

> "When I created an account on this website [reunion.com], …[it] harvested my address book at gmail.com, and sent emails to everyone in it saying [that I wanted to] "Connect with You!" *giving them the impression that I had lost contact with them and wanted them to create an account at reunion.com.* When my contacts received this, *it appeared to them to have come directly from my email address at gmail.com. I had created my account at reunion.com in response to a similar illegitimate message sent to me by reunion.com when a friend created an account there, which appeared to come directly from him, and one or two of my contacts created an account after receiving the message that appeared to be from me*, and their address books were raided as well. I was especially embarrassed when I realized that these messages had been sent to people I didn't even know, such as any person I had ever emailed, from my gmail account, about an internet order, at the UC Davis Extension Office, and other places of business."

(Calp. Decl., Ex. A (Page 46 of 108, Record #41 of 100; Reference 19243231) (emphasis added).)

Other examples of the consumer outrage over Reunion.com's false and deceptive e-mail marketing practices include the following (all included in Ex. A of the Calpotura Decl.):

- "I received invitation from reunion.com *that appeared to be sent from a friend inviting me to join site…. Email has subject line that is misleading,*

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

*suggesting a friend has invited me to join reunion.com.  That friend never invited me and had 400 people spammed from her contacts list."*  (Page 31 of 108, Record #28 of 100; Reference 19409016) (emphasis added)

• "Everyone from my email address book has received a *fraudulent email from what appears to be my email address, but is derived from reunion.com*." Page 99 of 108, Record #92 of 100; Reference 13347392) (emphasis added)

• "Apparently, reunion.com sent out emails to EVERYONE IN MY ADDRESS BOOK inviting them to join *on the pretense they're from me!*  This includes business contacts, old boyfriends, ex-husbands, etc.  *THIS IS INTERNET FRAUD!*"  (Page 70 of 108, Record #65 of 100; Reference 19710651) (emphasis, except for all capital letters, added)

• "*False emails were sent out to all of my email contacts (over 1000 email contacts) stating that I was looking for them thru Reunion.com.  Resolution Sought: I would like Reunion.com to cease and desist from false claims ….*"  (Page 57 of 108, Record #52 of 100; Reference 13792852) (emphasis added)

• "A friend I knew sent an email inviting me to join her on **www.reunion.com** Because I like my friend and had not heard from her in a while I went on the site **www.reunion.com**.  It prompted me to look in my addressbook to see who else was contacting me.  Once I did that their site downloaded my entire addressbook and sent out the same *misleading* email inviting my own friends to join me.  Once the site downloaded my email addresses there was no way to stop this process even though there was a big button: Next below it."  (Page 23 of 108, Record #20 of 100; Reference 19519304) (emphasis added)

• "*Reunion.com tricks you into going to website because 'somebody is looking for you'….*"  (Page 24 of 108, Record #21 of 100; Reference 19505085) (emphasis added)

• "This company [reunion.com] hacked my email system, *falsely telling my*

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

*contacts that I was 'looking for them' on their social networking website*."
(Page 78 of 108, Record #73 of 100; Reference 13539262) (emphasis added)

• "When you join for free, these folks (reunion.com) pull thousands of email addresses from other people and ***they send emails to them in my name (as if) I'm send[ing] it to them telling these folks I'm trying to contact them. It's a new spam***."  (Page 48 of 108, Record #43 of 100; Reference 13982232) (emphasis added)

• "Reunion.com sent me an email saying that a friend was trying to contact me. When you click on their link, they somehow download all of your own addressbook contacts and ***send the same email to these new contacts using YOUR name, as if you want to contact them.  …  It is a scam that is going around, and it is – or should be – illegal!!!***"  (Page 50 of 108; Record #45 of 100; Reference 13913612) (emphasis, except for all capital letters, added)

These types of consumer complaints explain why the Better Business Bureau has assigned Reunion.com a "D" rating, which is reserved for those troubling companies about which the Better Business Bureau has sufficient concerns that it recommends "caution in doing business with it."[2]   Indeed, the Bureau's report on Reunion.com states that "[c]omplaints contain ***a pattern of allegations that the company uses the email address book of those who sign up to deceptively email their contacts that they are searching for them.***"  *Id*. (emphasis added).

## III.   MOTION TO DISMISS STANDARD

A complaint should set forth "simple, concise and direct" allegations and "short and plain statement[s]" of jurisdiction and claims; "specific facts are not necessary," as a

---

[2]  The Better Business Bureau's report on Reunion.com, attached as Exhibit B to the Calpotura Declaration, may be viewed at the following web address (last visited on Sept. 12, 2008):

http://www.labbb.org/BBBWeb/Forms/Business/CompanyReportPage_Expository.aspx?CompanyID=13177175.  Plaintiffs have also requested that the Court take judicial notice of this document in Plaintiffs' Request for Judicial Notice, filed concurrently with this Opposition.

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

1   complaint "need only give the defendant fair notice of what the . . . claim is and the

2   grounds upon which it rests." Fed. R. Civ. P. 8; *Bell AtlanticCorp. v. Twombly*, 127 S. Ct.

3   1955, 1964 (2007).  In addition, when ruling on a defendant's motion to dismiss, a judge

4   must accept as true all of the factual allegations contained in the complaint." *Twombly*,

5   127 S. Ct. at 1975 (2007).  Moreover, all material allegations must be "construed in the

6   light most favorable to the non-moving party."  *In re: Gilead Sciences Securities Litig.*,

7   536 F.3d 1049,. 1055 (9th Cir. Aug. 11, 2008) (citations omitted) (reversing trial court's

8   dismissal).  The Complaint easily satisfies this standard.

9   **IV.    ARGUMENT**

10          **A.    The Plaintiffs' Claims Are Not Preempted.**

11          In  attempting  to  articulate  its  position,  Defendant  confusingly  combines  an

12  argument  concerning  *express*  statutory  preemption  with  an  argument  apparently

13  premised  on  *implied*  regulatory  preemption.    Properly  understood,  neither  doctrine

14  applies  here.   The  express  preemption  clause  of  CAN-SPAM  explicitly  provides  that  a

15  state  law  that  "prohibits  falsity  or  deception  in  any  portion  of  a  commercial  or  electronic

16  mail  message. . .,"  such  as  the  California  statute  at  issue  here,  is  _not_  preempted.   15

17  U.S.C.  §  7707(b)(1).   As  for  implied  preemption,  it  is  unavailable  under  the  federal

18  statutory  or  regulatory  scheme  because  Congress  did  not  intend  a  defense  under  CAN-

19  SPAM  to  apply  to  a  state  law  claim  concerning  deceptive  email  advertisements.

20  Furthermore,  even  if  implied  preemption  were  available,  the  defense  would  fail  as  a

21  matter  of  undisputed  fact,  as  explained  further  below.

22          **1.    Federal Preemption Doctrine Has Three Distinct Branches.**

23          Federal  law  preempts  state  law  in  only  three  circumstances.   First,  Congress  can

24  expressly  preempt  state  law  by  statute.   *English v. General Electric Co.,*  496  U.S.  72,  78-

25  79  (1990).   Second,  state  law  is  subject  to  implied  preemption  "if  it  regulates  conduct  in  a

26  field  that  Congress  intended  the  Federal  Government  to  occupy  exclusively."   *Id*.   Finally,

27  "state  law  is  preempted  to  the  extent  it  actually  conflicts  with  federal  law."   *Id*.   This  final

28  category  of  "implied  preemption,"  or  "actual  conflict"  preemption,  may  arise  in  either  of

CASE NO. 3:08-cv-03518-MMC                        **OPP. TO DEFENDANT'S  MOTION TO DISMISS**

1    two circumstances: (1) "where it is impossible for a private party to comply with both state

2    and federal requirements;" or (2) where "state law stands as an obstacle to the

3    accomplishment and execution of the full purposes and objectives of Congress." *Id.*

4    Regardless of the variant at issue, the "ultimate touchstone" of the preemption

5    inquiry is whether Congress intended to displace state law. *Cipollone v. Liggett Group,*

6    *Inc.,* 505 U.S. 504, 516 (1992).  Indeed, Congress' intent must be clear and manifest

7    before the Court may find preemption. *Id.* ("historic police powers of the States are not to

8    be superseded by Federal Act unless that is the clear and manifest purpose of

9    Congress.").  One reason for this is that "if the court erroneously finds preemption, the

10   State can do nothing about it, while if the court errs in the other direction, Congress can

11   correct the problem." *Chemical Specialties Manufacturers Association, Inc. v. Allenby,*

12   958 F.2d 941, 943 (9th Cir. 1992), *cert. denied,* 506 U.S. 825 (1992).

13           **2.    Plaintiffs' Claims are Not Subject to Express or Field Preemption.**

14

15   Plaintiff's claims are not barred by the doctrines of express or field preemption

16   because Congress expressly excluded state laws prohibiting falsity or deception in any

17   portion of a commercial electronic mail message from the preemption provision of CAN-

     SPAM.  Specifically, CAN-SPAM's express preemption provision provides as follows:

18

19           This chapter supersedes any statute, regulation, or rule of a State or political

20           subdivision of a State that expressly regulates the use of electronic mail to send

             commercial messages, ***except to the extent that any such statute, regulation,***

21           ***or rule prohibits falsity or deception in any portion of a commercial***

22           ***electronic mail message or information attached thereto.***

23   15 U.S.C. § 7707(b)(1) (emphasis added).  Because Section 17529.5 "prohibits falsity or

24   deception in… a commercial electronic mail message," the doctrine of express

25   preemption does not apply.[3]

26

27   _____

     [3]  Similarly, because Congress has exempted state statutes prohibiting falsity or
28   deception in commercial emails from the preemption provision of CAN-SPAM, it is plain
     that Congress did not intend to occupy the entire regulatory "field."

CASE NO. 3:08-cv-03518-MMC                          **OPP. TO DEFENDANT'S  MOTION TO DISMISS**

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

1   The only authority relied on by Defendant for its position-- *Kleffman v. Vonage*

2   *Holdings Corp.*, Civ.A. No. 07-2406, 2007 WL 1518650 (C.D.Cal. May 23, 2007) – is

3   readily distinguishable.  In *Kleffman*, the plaintiff complained that he had received eleven

4   different emails from eleven different domain names advertising Vonage telephone

5   service.  The Court held that the emails did not violate section 17529 because they were

6   not misleading – they accurately identified the senders, were plainly advertisements for

7   Vonage telephone service, and contained nothing false or misleading.  *Id*. at *2-4.  The

8   plaintiff apparently took issue with Vonage's ownership of multiple domains, which the

9   plaintiff contended was designed to evade the detection of spam filters.  The Court held

10  that such allegations do not actually allege that any aspect of the *individual* emails

11  themselves were false or deceptive, and state regulation concerning anything other than

12  the inclusion of deceptive content in an email, such as the number of domain names a

13  company may use for advertising, was expressly preempted by CAN-SPAM.  *Id*.  The

14  Court reasoned, citing the Senate Committee Report on CAN-SPAM, as follows:

15      [A] State law requiring some or all commercial e-mail to carry specific types of

16      labels, or to follow a certain format or contain specified content, would be

17      preempted.  ***By contrast, a State law prohibiting fraudulent or deceptive***

18      ***headers, subject lines, or content in commercial e-mail would not be***

19      ***preempted***….

20  *Id*. at *3 (emphasis added).  Here, unlike in *Vonage*, Plaintiffs have alleged that

21  the Defendant used fraudulent headers, subject lines, and content in its emails –

22  precisely the type of claim that *Vonage* held was <u>not</u> preempted.  *Id*.

23      An analysis of the statutory text of CAN-SPAM and the legislative history of the

24  statute does not reveal any intent on the part of Congress to give the "routine

25  conveyance" exemption preemptive force with respect to state law claims.  Indeed, in the

26  express preemption provision of the statute quoted above, which addresses the statute's

27  effect on state laws, it makes no mention of the "routine conveyance" defense.  Thus, the

28  defense has no application to California law and would not preempt Plaintiffs' claims

CASE NO. 3:08-cv-03518-MMC                    12            **OPP. TO DEFENDANT'S  MOTION TO DISMISS**

1    even if Defendant's conduct were a "routine conveyance," which it is not.

2        Notably, California law has an analog provision that exempts those engaged in a

3    "routine transmission" from liability.  However, that provision expressly excludes anyone

4    engaged in the "sending, or the knowing participation in the sending, of unsolicited

5    commercial email advertisements" from the scope of its exemption.  Cal. Bus. & Prof.

6    Code Section 17529.1(n).[4]   Not surprisingly, Reunion.com has failed to argue, let alone

7    mention, the California state law "routine transmission" provision.

8                    **3.      Plaintiffs' Claims are Not Subject to Implied Preemption.**

9        With no express statutory provision supporting its express preemption defense,

10   Defendant attempts to export the same concept to what appears to be an implied

11   preemption defense – which, as explained below – is likewise devoid of merit.

12                    **a.    The Inclusion of an Express Preemption Provision
                            Forecloses Implied Preemption Absent Clear and**
13                    **Manifest Congressional Intent to the Contrary.**

14       Congressional silence with respect to the preemptive force of CAN-SPAM's

15   "routine conveyance" provision does not merely foreclose an express preemption

16   defense.  On the contrary, the very fact that CAN-SPAM includes an express preemption

17   clause, which does not purport to export the federal "routine conveyance" defense to

18   state law claims, demonstrates that Congress did *not* intend such broad implied

19   preemption.  As the United States Supreme Court has held:

20           When Congress has considered the issue of pre-emption and has included

21           in the enacted legislation a provision explicitly addressing that issue, and

22           when that provision provides a "reliable indicium of congressional intent

23           with respect to state authority," "there is no need to infer congressional

24           intent to pre-empt state laws from the substantive provisions" of the

25   _____

26   [4] As the FTC itself has acknowledged, California is free to enact a more narrow and
     demanding definition of the exemption, because its regulatory standards generally "set a
27   floor below which trade practices cannot fall, and not a ceiling that precludes a more
     demanding state standard."  Amicus Brief of the United States, *Altria Group, Inc. v. Good*,
28   2008 WL 2472389 ("FTC Amicus") at *3 (June 2008) (signed by, *inter alia*, General
     Counsel for the FTC).

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

1   legislation.    Such reasoning is a variant of the familiar principle of

2   *expression unius est exclusio alterius*: Congress' enactment of a provision

3   defining the pre-emptive reach of a statute implies that matters beyond that

4   reach are not pre-empted.

5   *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 517 (1992) (internal citations omitted);

6   *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287-89 (1995) (recognizing that "*Cipollone*

7   supports an inference that an express pre-emption clause forecloses implied pre-

8   emption."); *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001) ("[O]ur task

9   is to identify the domain expressly pre-empted [by the statute's text]....").    Here,

10  Defendant has not identified any evidence that Congress intended CAN-SPAM to have a

11  greater preemptive effect (exporting the defense of routine conveyance to bar state law

12  claims) than what is expressly written in the statute – let alone "clear and manifest"

13  evidence of such intent.[5]

14              **b.    Even if Congress Had Intended Implied Preemption to be**
                         **Available Under CAN-SPAM, There Can Be No Implied**
15                       **Preemption by the FTC Absent an Explicit Rule Codified**
                         **in the CFR that Permits the Challenged Conduct.**
16

17        Nor can the discussion of a "routine conveyance" in the FTC Statement

    introducing the final CAN-SPAM FTC Rule relating form the basis of an implied
18
    preemption defense.    It is black letter law that the FTC cannot preempt state law unless
19
    the conduct at issue is permitted by an FTC Rule.    *American Fin'l Services Assn. v. FTC*,
20
    767 F.2d 957, 989-990 (D.C. Cir. 1985) (FTC Rule required for preemption); *Katherine*
21
    *Gibbs School v. FTC*, 612 F.2d 658, 668 (2nd Cir. 1979) (same); *U.S. v. Philip Morris*,
22
    263 F.Supp.2d 72, 78-81 (D.D.C. 2003) ("state prohibitions of... deceptive trade practices
23
    are not preempted <u>unless they conflict with an express FTC rule</u>.") (emphasis added);
24

25   [5]   Defense Counsel tellingly misquotes the FTC Statement on page 10 of its
     memorandum in support of its motion to dismiss as suggesting that the FTC declared
26   one to be exempt from liability under a "State Statute" if the entity's conduct conforms to
     the federal definition of a "routine conveyance."    On the contrary, the FTC stated that the
27   exemption applies to the CAN-SPAM act, not a "State Statute."    (FTC Statement at 73.)
     Indeed, there is no mention of state law at all anywhere in the FTC Statement on this
28   issue, further demonstrating that there has been no attempt by Congress or the FTC to
     preempt state law claims in this regard.

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

1    *State v. Amoco Oil Co.*, 97 Wis.2d 226, 239, 243 (Wis.Sup. Ct. 1980); *see also* Verkuil,

2    Paul R., *Preemption of State Law by the Federal Trade Commission*, 1976 Duke L.J.

3    225, 247 (1976) (concluding that legislative history makes clear that FTC Rule is required

4    for federal preemption).  The FTC agrees that its preemptive powers are so limited.  *See*

5    FTC Amicus, 2008 WL 2472389 at *21 ("In light of the carefully calibrated statutory

6    scheme delineating the enforceability of FTC rules and orders, only trade regulation

7    rules, litigated cease and desist orders, and consent orders . . . qualify as federal 'law'

8    that can preempt conflicting state law pursuant to the Supremacy Clause.").  Defendant

9    does not even purport to identify an FTC Rule that permits the conduct at issue here – as

10   there is no such FTC Rule.  *See* 16 C.F.R. §316.1 to 316.6 (there is no provision in the

11   final CAN-SPAM FTC Rule that establishes the contours of permissible conduct with

12   respect to the routine conveyance defense; in fact, the CAN-SPAM FTC Rule does not

13   even mention the topic of "forward to a friend" emails).  As a result, there can be no

14   implied preemption based on FTC Rule.

15       Here, in its introductory Statement accompanying its Final Rules implementing

16   CAN-SPAM, the FTC merely discussed certain factual scenarios, referred to as "forward

17   to a friend" website functions.  The discussion in the Statement itself does not even

18   purport to establish bright line rules (with one exception to be discussed below)

19   delineating what conduct is permitted, and what conduct is prohibited.  Rather, in the

20   Statement, the FTC concludes that such situations must be analyzed on a case-by-case

21   basis, with careful attention to the specific facts at issue.  (FTC Statement at 65.)  Thus,

22   there is neither a formal FTC Rule, nor even a less formal FTC pronouncement, that

23   explicitly permits Reunion.com's email marketing practices here.

24           **c.    Even if the Federal "Routine Conveyance" Defense Could
                     Be Invoked to Support an Implied Preemption Defense, It**

25           **Would Fail as a Matter of Fact – and Certainly Could Not
                     Be Resolved on a Motion to Dismiss.**

26
27       Even if Congress had intended the federal "routine conveyance" defense to apply

28   to the state law claims here, or if the FTC had formally promulgated FTC Rules

CASE NO. 3:08-cv-03518-MMC                              **OPP. TO DEFENDANT'S  MOTION TO DISMISS**

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

1   consistent with its analysis of the routine conveyance issue in the FTC Statement (both of

2   which are indisputably not the case), any implied preemption defense by Reunion.com

3   would fail as a matter of fact.

4       The thrust of Reunion.com's argument is that its website mechanism is

5   tantamount to a "forward to a friend" situation, which the FTC Statement indicated could

6   potentially qualify as a routine conveyance.  (*See* FTC Statement at 65-76.)  In essence,

7   the FTC described the "forward to a friend" function as a "web based mechanism" that

8   "includes a button that enables a visitor to the website to send an email advertising the

9   seller's product, service, or website."  (FTC Statement at 71.)  The FTC explains:

10       When the visitor clicks on the button, the seller requests the recipient's email

11       address and often additional information such as the visitor's name and email

12       address.  The seller may also enable the visitor to add text that will be included in

13       the message sent to the recipient.  Upon entering the information, the visitor must

14       press a "send" button for the message to be sent.

15   (FTC Statement at 71-72.)  Although this is the typical format in which the web based

16   mechanism appears, the FTC also made clear that the determination of whether a

17   "forward to a friend" mechanism can qualify as a routine conveyance under CAN-SPAM

18   is a "highly fact specific inquiry."  (FTC Statement at 65.)  Moreover, the FTC has

19   indicated that a routine conveyance under CAN-SPAM is "narrowly circumscribed."  )FTC

20   Statement at 73.)[6]

---

21

22   [6] At the time that CAN-SPAM was enacted, there is no indication that Congress even contemplated this particular web based mechanism.  Rather, as the legislative history of

23   the statute makes clear, Congress was concerned with protecting Internet Service Providers ("ISPs") from liability which merely transmit email messages authored by other

24   entities, such as Yahoo, AOL, or Hotmail.  Engaging in a purely technical function is the lynch pin of a "routine conveyance" as the term is defined by Congress:

25

26       However, the definition [of 'initiate' under CAN-SPAM] specifies that a company that merely engages in routine conveyance, such as an ISP that simply plays a

27       technical role in transmitting or routing a message, and is not involved in coordinating the recipient addresses for the marketing appeal, shall not be considered to have initiated the message.

28

Sen. Rep. 108-102 at 15 (2003), *reprinted in* 2004 U.S.C.CA.N. 2348, 2003 WL

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

In the promulgation process, the FTC received over forty submissions concerning the "Forward to a Friend" mechanism. (FTC Statement at 67.) In considering these submissions and discussing the issue, the FTC seized upon the importance of the "routine conveyance" being limited to conduct of a purely technical nature: "Where the seller goes beyond serving as a technical intermediary that transmits, routes, relays, handles or stores the email, the seller will be liable as the 'initiator' and 'sender' of the message forwarded from its website." (FTC Statement, p. 73.)

While the FTC discusses many factors to be considered in determining whether a commercial email advertiser is engaged in a routine conveyance, it does set forth one bright-line rule. According to the FTC, "*if a seller retains the email address of the person to whom the message is being forwarded for a reason other than relaying the forwarded message (such as for use in future marketing efforts), the seller would not fall within the routine conveyance exemption.*" (FTC Statement, p. 73, n. 192 (emphasis added).)[7]  This is because CAN-SPAM's "legislative history explains that

---

21680759.

[7] It is not surprising that the FTC adopted this bright-line rule. Every person or entity that submitted comments to the FTC discussing whether a routine conveyance could permit the entity engaged in the "forward to a friend" transaction to retain the recipient email addresses took the position that such conduct would render the routine conveyance defense unavailable. (*See* Calp. Decl. Ex. C.) Examples of relevant comments include the following:

- Defines the following as a criterion for "routine conveyance:" "the sender and recipient information is not retained or used for marketing purposes (unless either affirmatively signs up to receive marketing messages)." http://www.ftc.gov/os/comments/canspam3/516736-00117.pdf

- "In sum, Congress by providing the routine conveyance exception, clearly intended to exempt from the Act those whose involvement is limited to providing a electronic facility for the dissemination of friend-to-friend information, and where they do not obtain a email recipient list in the process." http://www.ftc.gov/os/comments/canspam3/516736-00101.pdf

- Specifies that a "forward-to-a-friend" function does not collect the information of the "receiving 'friend,'" and thus should be categorized as "routine conveyance." http://www.ftc.gov/os/comments/canspam3/516736-00100.pdf

1  a company engages in 'routine conveyance' when it 'simply plays a technical role in

2  transmitting or routing a message and is not involved in coordinating the recipient

3  addresses for the marketing appeal.'"  (FTC Statement, pp. 72-73.)[8]

4         Hence, it is plain that the Reunion.com emails at issue cannot constitute routine

5  conveyances, as a matter of law, because Reunion.com admits in its Privacy Policy that

6  it "retains the email address of the person to whom the message is being forwarded for a

7  reason other than relaying the forwarded message."  (*Id*. at n. 192.)  In Reunion.com's

8  first Privacy Policy, referenced in the Complaint and attached as Exhibit A to the Baird

9  Declaration, Reunion.com admits that it retains the email address of the person to whom

10  the message is being forwarded for the purpose of "tracking the success" of its marketing

11  program.  In the second Privacy Policy, also referenced in the Complaint and attached to

12  the Baird Declaration as Exhibit B, Reunion.com again admits that it stores the e-mail

13  address in order to send two more "reminder e-mails" if  its first commercial solicitation

14  proves unsuccessful, in addition to tracking the success of  its marketing program.

15         Obviously, Reunion.com's reasons for storing the emails are for non-technical

16  purposes; Reunion.com admittedly retains the emails in order to sustain and improve its

17  deceptive email marketing program.  Thus, Reunion.com's conduct fails the one bright-

18  line rule established by the FTC in order to claim the "routine conveyance" exemption.

19  No more is required to dispose of the Defendant's apparent implied preemption

20  argument.  Discovery will likely reveal even more facts bearing on this analysis.

21         Even if Reunion.com did not violate the FTC's one bright line rule, it would still not

22  _____

8    Although the FTC Statement contemplates a "narrowly circumscribed" routine
23  conveyance exemption, this does not mean that a company engaging in commercial
email marketing automatically faces staggering liability as Defendant argues. (Motion to
24  Dismiss at 18.)  Rather, companies can simply avoid the use of false and misleading
content to insulate themselves from liability.  Along these lines, Defendant makes
25  conclusory assertions that other more reputable and "legitimate" companies, such as
Facebook and LinkedIn, use the same email marketing techniques that Reunion.com
26  does, and that Plaintiffs' arguments, if accepted, would threaten these "legitimate"
businesses. (Motion to Dismiss at 15.)  In addition to being unsubstantiated, irrelevant,
27  and outside the scope of the pleadings and this motion, Plaintiff expects that discovery
will reveal that the assertion is also not true – and that Facebook and LinkedIn make
28  clear in the subject lines of their emails that the content of the message is an invitation to
do business with them, among other differences in the respective companies' practices.

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

be engaged in a "routine conveyance" in the form of a "forward to a friend" mechanism contemplated by the FTC.  This is because there are material factual differences between Reunion.com's conduct and the practices considered and discussed by the FTC.  First, the content of the commercial emails Reunion.com sends is substantially different from the content that a Reunion.com member would reasonably expect to be sent, even if the member had read the Privacy Policy.  Among other reasons, the emails falsely state that the member "looked for" the recipient on Reunion.com, but the recipient "[was]n't there."  Notably, there is no dispute that Reunion.com wrote the text of the emails in question and that the members had no input into the specific content of the emails.  (*See* Baird Decl. Exs. A and B (noting that "we", i.e., Reunion.com, "will send" the emails).)  Facts such as these demonstrate that Reunion.com was not acting as a mere "technical intermediary" engaged in a "routine conveyance," or, at the very least, demonstrate that there are factual issues that must be developed and clarified in discovery – rendering resolution of these issues at this early pleadings stage impossible and inappropriate.

In addition to the content of the emails reflecting that Reunion.com went beyond the role of a mere technical intermediary, Reunion.com's process by which the email addresses were coordinated for the marketing appeal varied substantially from that considered and discussed by the FTC.  Rather than utilizing a system whereby the visitor affirmatively elects to forward a web page to another person, Reunion.com has made the process of obtaining the contents of its members' email address books part of its registration process, merely to become a member.  (Complaint, ¶¶18-19.)  By obtaining members' passwords to their personal email accounts, Reunion.com is able to indiscriminately send bulk commercial email to every person in the address books (or in the case of Gmail users, every person who ever received an email from the member or sent an email to the member – which discovery will reveal), which could easily number in the thousands for an individual member (as evidenced by the FTC complaints attached as Ex. A to the Calpotura Declaration).  This is a far cry from the "forward to a friend"

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

1   mechanisms described by the FTC (or described in any of the over forty submissions

2   provided to the FTC).   Whether Reunion.com's web mechanism is materially different

3   from the mechanisms considered by the FTC such that Reunion.com cannot be deemed

4   a mere technical intermediary (by having played a material role in "coordinating the

5   recipient addresses for the marketing appeal") is at least a question of fact for the jury.

6   (FTC Statement at 73.)   Given the lack of legal precedent on the issue, it would be

7   improper to take up this factual issue on a motion to dismiss.   Resolving facts on a

8   motion to dismiss is particularly inappropriate where, as here, there are novel issues of

9   law at stake.   *See e.g., Jackson National Life Ins. Co. v. Greycliff Partners Ltd.*, 226 B.R.

10  407, 419 (S.C. 1995) (declining to determine novel issues on a Rule 12(b)(6) motion to

11  dismiss); *Branch v. FDIC*, 825 F.Supp. 384, 397 (D.Mass. 1993) (novel issues are "best

12  tested for legal sufficiency in light of actual, rather than alleged facts.").

13       In sum, Reunion.com has not engaged in a "routine conveyance" as a matter of

14  fact, because it retains the recipient email addresses even though it is not necessary to

15  do so when serving as a mere technical intermediary.   In addition, it authors and sends

16  emails that not only differ from the emails that it states it will send, but include false and

17  deceptive statements designed to trick the recipients into opening the emails and joining

18  Reunion.com.    The Reunion.com member does not draft, edit, or preview these

19  messages before they are sent.   At the very least, whether Reunion.com's conduct can

20  be characterized as a mere "routine conveyance" is a disputed question of fact.

21       **B.    Whether Emails Contain False and Misleading From or Subject Lines,
             or Other Headers, is a Question of Fact for the Jury.**

22

23  Aware its preemption arguments must fail, Defendant's last ditch argument is that

24  the emails at issue here are not deceptive or misleading as a matter of law.   This

25  argument flies in the face of settled law that whether a practice is deceptive, fraudulent or

26  unfair is a question of fact that cannot be decided on a motion to dismiss.   *See e.g.,*

27  *Williams v. Gerber Product Co.*, 523 F.3d 934, 939 (9th Cir. 2008) ("California courts,

28  however, have recognized that whether a business practice is deceptive will usually be a

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

1  question of fact not appropriate for decision on demurrer."); *Slack v. Fair Isaac Corp.*, 390

2  F.Supp.2d 906, 913 (N.D.Cal. 2005) ("determining whether defendants' conduct amounts

3  to a fraudulent or deceptive practice . . . involves questions of fact that are not properly

4  addressed on a motion to dismiss."); *Foresberg v. Fidelity Nat'l Credit Serv's Ltd.*, Civ. A.

5  No. 03-2193, 2004 WL 3510771 at *5 (S.D.Cal. Feb. 26, 2004) ("determination of

6  whether . . . statements were false, deceptive or misleading . . . is a factual question and

7  would be inappropriately resolved on a motion to dismiss."); *Linear Technology Corp. v.*

8  *Applied Materials, Inc.,* 152 Cal. App. 4th 115, 135 (2007) ("Whether a practice is

9  deceptive, fraudulent, or unfair is generally a question of fact which requires

10  'consideration and weighing of evidence from both sides' and which usually cannot be

11  made on demurrer.").  Defendant's conclusory assertion that the "emails are simply not

12  misleading" is wrong on its face and inappropriately advanced in a motion to dismiss.

13        Plaintiffs have alleged that the "From" lines, the "Subject" lines, and the headers of

14  the emails are false and misleading because they give the false impression that

15  Reunion.com is not the sender of the email, and that the email is not an unsolicited

16  commercial advertisement.   In addition, Plaintiffs allege that Reunion.com lacks the

17  permission of the owner of the third party domain names that were included in the "From"

18  lines, a factual issue that Reunion.com's conclusory assertions in its moving papers

19  cannot resolve at this stage of the proceedings.[9]   By including the names of the

20  _____
   [9] Defendant also argues that that a recently passed bill by the legislature which explicitly
21  states that neither domain names nor email addresses can be used in commercial email
   advertisements without third party permission means that the current law does not
22  prohibit the inclusion of domain names such as Yahoo or Hotmail when included merely
   as part of an email address in a From line.  (Motion to Dismiss at 17-18.)  However, as
23  the legislative history shows, the amendment simply clarifies that the inclusion of domain
   names as part of email addresses is one specific example of illicit domain name usage
24  already subject to the "current prohibition:"

25        As e-mail addresses must include a domain name, **this addition provides
      a more specific example of the current prohibition as it relates to**
26      **domain names** and has the effect of requiring consent of a third party
      before including their e-mail address in an e-mail advertisement…
27

28  (*See* Calp.Decl., Ex. D, Comment 2, (emphasis added)); *see*
   http://www.leginfo.ca.gov/pub/07-08/bill/asm/ab_2901-

CASE NO. 3:08-cv-03518-MMC                                    **OPP. TO DEFENDANT'S  MOTION TO DISMISS**

individuals in the "From" line (and in some cases their email addresses and third party domain names of their email service providers), and by failing to mention Reunion.com in the subject line of the message, recipients are wrongly led to believe that the email is from a person, not an advertiser, and of a purely personal, not commercial, nature. This is a factual question that cannot be resolved now on a motion to dismiss.

Indeed, with respect to the subject lines, the case is similar to the facts presented in *MySpace, Inc. v. The Globe.com,* Civ. A. No. 06-3391, 2007 WL 1686966 at *6-8 (C.D.Cal., Feb. 27, 2007), in which the Court found violations of CAN-SPAM and Section 17529.5.   There, the Defendant, TGLO or the Globe, among other things, sent emails concerning their product (a phone) with misleading subject lines stating "the new MySpace phone" and "the new phone for MySpace."   These headings implied that their product was affiliated with MySpace when it was not. *Id.*  In contrast, the court found that a separate heading which read "the new tglo phone for MySpace" did not violate the statute because it referenced "tglo" in a way that accurately described the product as separate and distinct from MySpace. *Id.*  Here, as is abundantly clear from the FTC complaints attached as Ex. A to the Calpotura Declaration, the subject lines "Please Connect With Me :-)", or "[Jane Doe] Wants to Connect with You", with no reference to Reunion.com, misleadingly conveyed the impression that the email was a personal request to connect with an individual, rather than a commercial e-mail solicitation from Reunion.com.  Defendant's bald assertions to the contrary, that these subject lines are "purely descriptive" and "are clearly not likely to mislead," are classic trial arguments, and not appropriate for resolution on a motion to dismiss.

*///*

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com

2950/ab_2950_cfa_20080626_133720_sen_comm.html

1   **V.      CONCLUSION**

2          For all the foregoing reasons, Plaintiffs respectfully request that the Court deny

3   Defendant's Motion to Dismiss.  If the Court is inclined to grant the Motion to Dismiss,

4   Plaintiff respectfully request leave to amend the complaint.

5

6   DATED:  September 12, 2008                    KRONENBERGER BURGOYNE, LLP

7

8                                           By:  ___/s/  Karl S. Kronenberger_____

9                                                  Karl S. Kronenberger
                                                   Henry M. Burgoyne, III
10                                                 Jeffrey M. Rosenfeld
                                                   Attorney for Plaintiffs
11

12

13  SHAPIRO HABER & URMY LLP
    Edward F. Haber (admitted *pro hac vice*)
14  Todd S. Heyman (admitted *pro hac vice*)
    Robert E. Ditzion (admitted *pro hac vice*)
15  53 State Street
    Boston, MA 02109
16  Telephone: (617) 439-3939
    Facsimile: (617) 439-0134
17  ehaber@shulaw.com
    theyman@shulaw.com
18  rditzion@shulaw.com

19

20

21

22

23

24

25

26

27

28

CASE NO. 3:08-cv-03518-MMC                23              **OPP. TO DEFENDANT'S  MOTION TO DISMISS**

KRONENBERGER BURGOYNE, LLP
150 Post Street, Suite 520
San Francisco, CA 94108
www.KronenbergerLaw.com